BENJAMIN W. HAILE, OSB #040660
Ben@portlandlawcollective.com
Portland Law Collective, LLP
1130 SW Morrison St, Suite 407
Portland, OR  97205
Telephone: (503) 228-1889
Facsimile:  (503) 223-4518

MONICA L. MILLER
American Humanist Association
1777 T Street  N.W., Washington, D.C, 20009
*phone* (202) 238-9088 */ facsimile* (202) 238-9003
mmiller@americanhumanist.org
CA Bar: 288343 / DC Bar: 101625
(motion for admission *pro hav vice* concurrently filed)

DAVID A. NIOSE
Law Offices of David Niose
348 Lunenburg Street, Suite 202
Fitchburg, MA 01420
978-343-0800
dniose@nioselaw.com
Mass Bar: 556484
(motion for admission *pro hav vice* concurrently filed)

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| **AMERICAN HUMANIST ASSOCIATION and JASON MICHAEL HOLDEN**<br><br>Plaintiffs<br><br>v.<br><br>**UNITED STATES OF AMERICA, FEDERAL BUREAU OF PRISONS, FEDERAL CORRECTIONAL INSTITUTION SHERIDAN OREGON, JUAN D. CASTILLO, WARDEN MARION FEATHER, and CHAPLAIN RICHARD KOWALCZYK**<br><br>Defendants | Case No.<br><br>VERIFIED  COMPLAINT<br>Civil Rights Action  (42 U.S.C. § 1983)<br>First Amendment and Fifth Amendment<br>*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).<br>DEMAND FOR JURY TRIAL |

1  - VERIFIED COMPLAINT

## VERIFIED COMPLAINT

Seeking to protect and vindicate their civil liberties and constitutional rights, including the constitutional requirement of separation of church and state and equal protection, the above-captioned Plaintiffs state as their complaint against the above-captioned Defendants the following:

## NATURE OF THE CLAIMS

1.    This action arises out of the Defendants': (1) refusal to allow a federal inmate with sincerely held Humanist beliefs to form a Humanist study group to meet on the same terms that the Defendants authorize inmates of other religious traditions to meet; (2) refusal to permit federal inmates to form an Atheist study group to meet on the same terms that inmates who are part of recognized theistic groups meet, despite the fact that Atheism is an officially recognized religion within the institution; and (3) refusal to recognize Humanism as an official religious assignment option. The Defendants' policy and practice of discriminating against non-theistic inmates and Humanist inmates in particular, because of their religious beliefs, violates the Establishment Clause of the First Amendment of the United States Constitution, as well as the Equal Protection mandate of the Fifth Amendment of the United States Constitution.

2.    The Plaintiffs seek injunctive and declaratory relief and damages under 42 U.S.C. § 1983 and *Bivens* against the Defendants to redress these constitutional violations, together with recovery of attorney's fees and costs under 42 U.S.C. § 1988 (b).

## JURISDICTION AND VENUE

3.    This case arises under the First and Fifth Amendments to the Constitution of the United States and 42 U.S.C. § 1983 and presents a federal question within this Court's

jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  The Court has the authority to issue a declaratory judgment under 28 U.S.C. § 2201 and to provide injunctive relief and damages under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65.   Damages may be awarded pursuant to *Bivens*.

4.    Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391 (b)(2) because the events giving rise to the Plaintiffs' claims occurred herein.

## PARTIES

5.    The first Plaintiff, the American Humanist Association ("AHA"), is a national nonprofit 501(c)(3) organization incorporated in Illinois with a principal place of business at 1777 T Street N.W., Washington, D.C. AHA is a membership organization with over 175 chapters and affiliates nationwide and over 24,800 members, including members residing in Oregon.  AHA promotes humanism and is dedicated to advancing and preserving separation of church and state and the constitutional rights of humanists, atheists and other freethinkers.  AHA brings this action to assert the constitutional rights of its members, including Humanist inmates in other federal institutions.

6.    Plaintiff Jason Michael Holden ("Holden"), inmate #34169-086, is a resident of Washington State. At all relevant times, Holden was incarcerated in Oregon. Holden is an inmate in the custody of U.S. Department of Justice ("DOJ"), Federal Bureau of Prisons ("BOP"), incarcerated at the Federal Correctional Institution ("FCI") in Sheridan, Oregon ("FCI Sheridan"). Holden arrived at FCI Sheridan April 21, 2010.

7.    Defendant BOP is an agency of the United States government.

8.    Defendant Juan D. Castillo ("Castillo") is the Regional Director of the Western Region of the BOP.

9.     Defendant Marion Feather ("Feather") is the Warden at FCI Sheridan.

10.     Defendant Richard Kowalczyk ("Kowalczyk") was the Supervisor of Religious Services at FCI Sheridan during the events described herein.

## FACTS

11.     Holden is an inmate at FCI Sheridan who has sincerely held Humanist beliefs. Humanism is his religion, which guides him through whatever life presents.

12.     FCI Sheridan is a federal prison operated by the BOP. It is located at 27072 Ballston Road, Sheridan, Oregon, 97378.

13.     FCI Sheridan currently houses approximately 1,836 inmates.

14.     Holden is a member of the AHA as well as the Humanist Community of Silicon Valley (HCSV), also known as the "Humanist Community," a chapter of the AHA.  The HCSV is a separate 501 (c)(3) and is recognized as a Humanist Church in the State of California. It was first incorporated in 1962 as The Humanist Community of San Jose. The bylaws of HCSV provide in part: "Section 1. Purpose The primary purpose is to establish a church based on the religion of Humanism in order to promote humanistic values in everyday life, to develop wider knowledge of and support for Humanism, and to ordain and record qualified ministers and invest them with authority to carry on their work of ministrations. We concur with John Dewey that religion is 'that which introduces perspective into life' and with Julian Huxley's definition as 'the organ of humanity concerned with human destiny.'" In 1967, the HCSV became a Chapter of the AHA, and continues to work closely with the AHA.

15.    From 1990 through 1999, the HCSV held weekly meetings on every Sunday at Stanford University. Then stricter University rules compelled the organization to seek another meeting place. Since then, they have held Sunday meetings at various places in Palo Alto.

16.    The HCSV celebrates various holidays including National Day of Reason (May 2), Easter Holiday (a secular occasion referred to as the Spring Festival), Darwin Day (February 12), the Nineteenth Amendment (August 26), and Halloween (the festival of Samhain), among others. The HCSV also has a Family Program similar to a Christian Sunday School. The HCSV Family Program is a collection of local families who meets every Sunday morning to talk, play, experiment, and learn from each other. As Humanists, they teach their children to appreciate the wonders of the natural world, and to develop an ethical code based on treating fellow human beings with kindness and respect.

17.    Humanism is Holden's religion, which comforts and guides him in the way that religions traditionally provide such comfort and guidance. By practicing Humanist principles in his relationships, he is confident that he is acting in a positive way. Seeing things through a Humanist lens creates within him a spiritual connection with the natural world.  Humanism gives Holden inner peace and security and has helped him realize the natural gift of his life.

18.    Humanist principles are promoted and defended by formal organizations such as the AHA (which provides a statement of Humanist principles in a document known as "Humanism and Its Aspirations," signed by 21 Nobel laureates and thousands of others), as well as the International Humanist and Ethical Union (which provides a statement of Humanist principles known as "The Amsterdam Declaration").

19.    Whereas Atheism is a religious view that essentially addresses only the specific issue of the existence of a deity, the Humanism affirmed by Holden is a broader religious world view that includes, in addition to a non-theistic view on the question of deities, an affirmative naturalistic outlook; an acceptance of reason, rational analysis, logic, and empiricism as the primary means of attaining truth; an affirmative recognition of ethical duties; and a strong commitment to human rights.

20.    Humanism also has formal religious structure, with clergy (usually known as "celebrants" who perform Humanist weddings, funerals, baby-welcoming ceremonies, counseling, and other functions commonly performed by clergy), chaplains (including a Humanist Chaplain at Harvard University), and with formal entities dedicated to the practice of religious Humanism, such as the American Ethical Union (based on the Ethical Culture movement founded by Felix Adler in 1876) and the Society for Humanistic Judaism (founded by Rabbi Sherwin Wine in 1969), among others.  Religious Humanism also has a strong history and continuing tradition within the Unitarian Church (now formally known as the Unitarian Universalist Association).

21.    The AHA's adjunct organization, the Humanist Society, is a religious 501(c)(3) organization. The Humanist Society prepares Humanist Celebrants to lead ceremonial observances across the nation and worldwide, including weddings, memorial services, and other life cycle events. The Humanist Society started in 1939 by a group of Quakers who decided to form a nontheistic society based on similar goals and beliefs. In humanism's tenets they saw the promise of a genuine union between science and ethics. It was therefore with this union in mind that this small band of former Quakers incorporated, in December 1939, under the state laws of California the Humanist Society of Friends as a religious, educational, charitable nonprofit

organization authorized to issue charters anywhere in the world and to train and certify people, who upon endorsement would be accorded the same rights and privileges granted by law to priests, ministers, and rabbis of traditional theistic religions.

22.    Modern Humanism, also called Naturalistic Humanism, Scientific Humanism, Ethical Humanism, and Democratic Humanism, is defined by one of its leading proponents, Corliss Lamont, as "a naturalistic philosophy that rejects all supernaturalism and relies primarily upon reason and science, democracy and human compassion." Modern Humanism has a dual origin, both secular and religious, and these constitute its sub-categories.

23.    Religious Humanism largely emerged out of Ethical Culture, Unitarianism, and Universalism. Today, many Unitarian Universalist congregations and all Ethical Culture societies describe themselves as humanist in the modern sense. To serve personal needs, Religious Humanism offers a basis for moral values, an inspiring set of ideals, methods for dealing with life's harsher realities, a rationale for living life joyously, and an overall sense of purpose.  Religious Humanism rejects the existence of a supreme being.

24.    Secular Humanism is an outgrowth of eighteenth century enlightenment rationalism and nineteenth century freethought. Many secular groups, such as the Council for Secular Humanism and the American Rationalist Federation, and many otherwise unaffiliated academic philosophers and scientists, advocate this philosophy.

25.    Secular and Religious Humanists both share the same worldview and the same basic principles. This is made evident by the fact that both Secular and Religious Humanists were among the signers of Humanist Manifesto I in 1933, Humanist Manifesto II in 1973, and Humanist Manifesto III in 2003.

26.    When an inmate is admitted to the FCI, the inmate may designate a religious preference assignment. Unit staff will enter the religious preference assignment (RLG) into a system called SENTRY. SENTRY is a real-time information system consisting of various applications for processing sensitive but unclassified inmate information and for property management. Data collected and stored in the system includes information relating to the care, classification, subsistence, protection, discipline, and programs of federal inmates. SENTRY was developed and implemented in 1981.

27.    The FCI's Chaplain is responsible for approving inmate religious requests and assignments.

28.    Holden wished to identify as a Humanist on his official record with the FCI.

29.    As of January 6, 2014, FCI Sheridan recognizes the following religious assignments (hereafter referred to as "FCI-recognized religions"):

    i.   Atheist

    ii.   Adventist (7th Day Adventist)

    iii.   American Indian

    iv.   Buddhist

    v.   Catholic

    vi.   Church of Christ

    vii.   Hindu

  viii. Jehovah's Witness

  ix. Jewish

  x. Messianic

  xi. Moorish Science Temple

  xii. Mormon

  xiii. Muslim

  xiv. Nation of Islam

  xv. No Preference

  xvi. Non-Trinitarian

  xvii. Orthodox

  xviii. Other

  xix. Pagan

  xx. Protestant

  xxi. Rastafarian

  xxii. Santeria

  xxiii. Sikh

  xxiv. Unknown

30.     The FCI also recognizes the following sub-groups within several of the above religious assignments and permits inmates of the following to meet in their respective sub-groups in Religious Services:

     i.   Spanish Protestant

     ii.  Native American Church

     iii. Native American "Hawaiin" (sic)

     iv. Druid

     v.  Odinist / Asatru

31.     The FCI does not recognize Humanist as a religious assignment option.

32.     It is the BOP's position that Humanism is not a religion.

33.     The BOP and FCI Sheridan recognize Atheism as a religion. An inmate may select Atheist as a religious assignment option.

34.     The BOP and FCI Sheridan do not recognize subgroups of Atheist religions in the same way that they recognize subgroups of Christian, Pagan and Islamic religions.

35.     On or about April 10, 2012, Holden sought permission to make his religious assignment in SENTRY "Humanist."

36.     The Unit Team informed Holden that the change had to be done by the Chaplain's office.

37.    On or about April 15, 2012, Holden spoke with then Assistant Chaplain Jason Henderson ("Henderson") about making his religious status as Humanist.

38.    Henderson informed Holden that "Humanist" was not an option.

39.    Since the option of "Atheist" was available, and Holden felt that it was the closest label to his beliefs, Holden selected that assignment instead.

40.    In the time that Holden has been incarcerated at FCI Sheridan, at least seven other inmates at FCI Sheridan selected the religious assignment "Atheist" after requesting "Humanist" and being told it was not an option. These inmates include, but are not limited to:

    i.  Roy Rudy #15876-006 (released)

    ii.  Bruce Jones #12236-031

    iii.  Steven Diamond #59247-065

    iv.  Robert McCullen #73171-065

    v.  Bill C. Johnson #21629-045

    vi.  Ben Gnesa #41178-086

    vii.  Dan Page #38014-086 (released)

41.    Although Holden is *also* an Atheist, the designation of "Atheist" does not describe his sincerely held beliefs.  While his naturalistic humanism includes atheism, he does not necessarily share the same beliefs as Atheists in general. "Atheist" works no better for Holden than "theist" would for a Christian, Hindu, or Muslim inmate.

42.     Humanism is more than just disbelief in deities. There are Atheists who are not Humanists, because they do not accept the naturalistic epistemology of Humanism and/or they do not accept the ethics of Humanism. There are Atheists who believe in supernatural phenomena other than gods, for example, and there are Atheists who affirmatively reject the progressive values of Humanism such as social justice, economic justice, environmental consciousness, women's right, and similar values.

43.     Some Buddhists are also Atheists, but Buddhism is its own religious assignment option in the BOP and at FCI Sheridan.

44.     Classifying all Atheists in single umbrella group, "Atheist," is akin to classifying all Christian, Hindu and Islamic inmates under one "Theist" umbrella group.

45.     However, the FCI permits Theistic inmates to identify in SENTRY with the specific Theistic tradition to which they belong.  This in turn, entitles those Theistic inmates to meet, study and discuss their commonly held beliefs in their respective Theistic groups during a designated time period in Religious Services.

46.     Not only does FCI permit Theistic inmates to identify with the specific Theistic tradition to which they belong, but it also permits inmates within those Theistic traditions to identify with the specific religious sect to which they belong.

47.     Christian and Islamic inmates have the option of identifying with the specific religious sect to which they belong.

48.    Christians are divided into subgroups. A Christian inmate may select, among other things: Adventist, Catholic, Church of Christ, Jehovah's Witness, Mormon, Non-Trinitarian or Protestant.

49.    If Catholic inmates wished to form an inmate study group in Religious Services, they would not be required to meet as one Christian umbrella group. Nor would they be required to meet as one Theistic group, which would include, among other things, Muslim and Jewish inmates. The Catholic inmates could have a separate study group from the Mormon inmates. The Jehovah's Witnesses have a separate study group, as do the 7th Day Adventists.

50.    An inmate of the Islamic faith may select, *inter alia,* Muslim, Moorish Science Temple, or Nation of Islam.  The Muslim inmates may meet in a study group separate from the Nation of Islam inmates, who have their own study group.

51.    Pagans have the option of meeting in sub-groups in Religious Services. They may elect to meet with the Pagan study group, Druid study group or Odonist study group. The FCI Sheridan allows Druid inmates to meet in a study group separate from Odonist inmates, who have their own study group.

52.    Inmates who are members of FCI-recognized religions receive the following rights and benefits: (1) "proscription days" for religious holidays; (2) at least one hour of classroom/study time a week; (3) at least one hour of worship time each week; (4) the ability to congregate with other members of the religious group.

53.    Inmates who are not members of FCI-recognized religions, such as Humanists, do not receive the above rights and benefits.

54.     Additionally, the BOP permits community volunteers to come into the prison to meet with the respective FCI-recognized religious groups.

55.     To receive any religious holidays of work proscription, public fast or ceremonial meals, an inmate's religious preference must be entered in SENTRY.

56.     Inmates who are members of FCI-recognized religions are allowed to meet with their respective subgroups so that their communities can develop their ethical foundations with some sense of consistency in their teaching.

57.     Humanist inmates cannot meet in study groups in the same way inmates who are members of FCI-recognized religions can meet.

58.     Humanist inmates at FCI Sheridan have no venue for meetings.

59.     Atheist inmates at FCI Sheridan have no venue for meetings.

60.     Inmates are not allowed to assemble in groups of more than four at recreation.

61.     FCI-recognized religious inmates are permitted to meet in groups of more than four to discuss their religious beliefs with each other during a designated time period.

62.      In Religious Services, four or more inmates can use the time allotted for their FCI-recognized religious group to meet.

63.     In the months of October, November and December 2013, the following religious groups held meetings through the Religious Services Program approximately once a week (Exhibit 1):

      i.  Hindu Study

14- VERIFIED COMPLAINT

    ii.   Muslim Taleem

   iii.   Native American Study

   iv.   Buddhist Study

    v.   Nation of Islam Study

   vi.   Jehovah Witness Study

  vii.   Catholic Study

 viii.   Mormon Study

   ix.   Spanish Bible Study

    x.   Druid Study

   xi.   Native American ("Hawaiin [sic]") Study

  xii.   Sikh Study

 xiii.   Odinist / Asatru Study

 xiv.   Rastafarian Study

  xv.   Jehovah's Witness Spanish Study

 xvi.   7th Day Adventist Study

64.    The Hindu Study group met in Classroom 1 from 12:00-1:30 pm on Mondays during the months of October, November and December 2013.

65.    The Native American Study group met in the Round Chapel from 1:30-3:00 pm on Mondays during the months of October, November and December 2013.

66.    The Buddhist Study group met in Classroom 1 from 6:00-8:00 pm on Mondays during the months of October, November and December 2013.

67.    The Muslim study group met in the Round Chapel from 12:00-1:30 pm on Mondays during the months of October, November and December 2013.

68.    The Nation of Islam Study group met in Classroom 2 from 6:00-8:00 pm on Mondays during the months of October, November and December 2013.

69.    The Jehovah Witness Study group met in the Round Chapel from 9:00-10:30 am on Wednesdays during the months of October, November and December 2013.

70.    The Catholic Study group met in the Round Chapel from 12:00-1:30 pm on Wednesdays during the months of October, November and December 2013.

71.    The Mormon Study group met in Classroom 2 at 1:30-3:00 pm on Wednesdays during the months of October, November and December 2013.

72.    The Spanish Bible Study met in the Large Chapel at 12:00-1:30 pm on Thursdays during the months of October, November and December 2013.

73.    The Druid Study group met in the Round Chapel from 12:00-1:30 pm on Thursdays during the months of October, November and December 2013.

74.    The Native American ("Hawaiin [sic]") Study group met in Classroom 1 from 6:00-8:00 pm on Thursdays during the months of October, November and December 2013.

75.     The Sikh Study group met in Classroom 2 from 6:00-8:00 pm on Thursdays during the months of October, November and December 2013.

76.     The Odinist / Asatru Study group met in the Round Chapel from 1:30-3:00 pm on Fridays during the months of October, November and December 2013.

77.     The Rastafarian Study group met in Classroom 1 from 1:30-3:00 pm on Fridays during the months of October, November and December 2013.

78.     The Jehovah's Witness Spanish Study group met in Classroom 2 from 12:00-1:30 pm on Saturdays during the months of October, November and December 2013.

79.     The 7th Day Adventist Study met in Classroom 1 from 1:30-3:00 pm on Saturdays during the months of October, November and December 2013.

80.     During the months of October, November and December, the Hindu group had two participating members.

81.     During the months of October, November and December, the Buddhist group had four participating members, excluding any volunteer leader of the group.

82.     During the months of October, November and December, the Sikh group had two participating members.

83.     During the months of October, November and December, the 7th Day Adventist group had five participating members.

84.     There were approximately ten members of the Jehovah Witness Study group during the months of October, November and December 2013.

17- VERIFIED COMPLAINT

85.    There were approximately ten members of the Druid Study group during the months of October, November and December 2013.

86.    There were approximately ten members of the Muslim Study group during the months of October, November and December 2013.

87.    There were approximately ten members of the Nation of Islam Study group during the months of October, November and December 2013.

88.    The reason that Humanist inmates were denied the opportunity to meet like other religious groups was not because the number of Humanist inmates desiring to meet was smaller than the number of inmates wishing to meet in other religious groups.

89.    In addition to the above, Religious Services also held "FAITH" sessions multiple times a week during the months of October, November and December 2013. A FAITH session is designed for inmates of the Christian faith.

90.    A FAITH session was held on Mondays at 6:00-8:00 pm in the Large Chapel. This session was titled "FAITH: Fundamentals of Belief."

91.    A FAITH session was held on Tuesdays from 9:00-10:30 am in the Round Chapel entitled "FAITH: Marriage Enhancement Training."

92.    A FAITH session was held on Thursdays in the Large Chapel from 6:00-8:00 pm entitled "FAITH: Prison Restoration Ministry."

93.    A FAITH session was held on Fridays from 6:00-8:00 pm in the Large Chapel entitled "FAITH: Full Gospel Businessmen Services."

94.     The non-volunteer led FAITH programs are video classes.

95.     Humanist inmates cannot reserve a time slot to meet with each other as a group in Religious Services.

96.     Only inmates of FCI-recognized religions are permitted to reserve time to meet as a group in Religious Services.

97.     Atheist inmates at FCI Sheridan, despite being listed as an FCI-recognized religion, have no venue for meetings at FCI.

98.     Inmates who are members of FCI-recognized religions other than Atheism are permitted to meet during a designated time period in Religious Services for group worship time.

99.     Inmates who are not members of FCI-recognized religions may not reserve time in Religious Services for religious worship.

100.    Currently, Humanist inmates may not reserve a meeting time or place in Religious Services for Humanist worship.

101.    In the months of October, November and December 2013, the FCI scheduled time and space for the following *worship* groups to meet:

  i. Spanish Protestant Worship (Sunday, 12:00-1:30 pm) in the Large Chapel

  ii. Christian Worship Service (Sunday 1:30-3:00 pm) in the Large Chapel

  iii. Hindu Worship Service (Sunday 6:00-8:00 pm) in Classroom 1

  iv. Jehovah's Witness Service (Monday 6:00-8:00 pm) in the Round Chapel

v.   Native American Church (Tuesday 1:30-3:00 pm) in the Outdoor Worship Area

vi.   Druid Worship (Wednesday 12:00-3:00 pm) in the Outdoor Worship Area

vii.   Sikh Worship (Wednesday 1:30-3:00 pm) in Classroom 1

viii.   Santeria Worship Service (Thursday 6:00-8:00 pm) in the Round Chapel

ix.   Muslim Jumah Prayer (Friday 12:00-1:30 pm) in the Large Chapel

x.   Jewish Sabbath (Friday 5:00-7:00 pm) in Classroom 2

xi.   7th Day Adventist Worship Service (Friday 6:00-8:00 pm) in Classroom 1

xii.   Catholic Mass (Saturday 12:00-1:30 pm) in the Round Chapel

xiii.   Rastafarian Worship (Saturday 12:00-1:30 pm) in Classroom 1

xiv.   Odinist / Asatru Worship (Saturday 12:00-3:00 pm) in the Outdoor Worship Area

xv.   Buddhist Worship Service (Saturday 1:30-3:00 pm) in Classroom 2

102.    The Buddhist Worship Service consists of watching movies or meditation.

103.    On August 17, 2012, Humanists of Sheridan was established as an AHA affiliate group.  Of the original five members, three are still incarcerated at FCI Sheridan.

104.    There are at least ten additional inmates currently incarcerated at FCI Sheridan that are interested in joining a Humanist inmate group because each of these individuals identifies as Humanist.

105.    If an inmate wants to have a new or "unfamiliar" religion officially recognized with the FCI, he must fill out form BP-822 (entitled "NEW OR UNFAMILIAR RELIGIOUS COMPONENTS QUESTIONNAIRE").

106.    This form must be submitted to the FCI's Chaplain for routing to the Central Office Religious Issues Committee ("RIC") through the Warden and Regional Director. P5360.09.

107.    Upon completing the review, the RIC will make recommendations to the Warden regarding the request's appropriateness. The Warden will determine the local disposition of the request after the institution receives the RIC recommendations. P5360.09.

108.    Decisions regarding the Chaplaincy Services program's expansion rest with the Warden.

109.    The instructions on the form provide in part: "Inmates requesting the introduction of a new component to the Religious Service program (schedule, meeting time and space, religious items and attire) must provide the chaplain a comprehensive description of the religion or component using this form."

110.    On April 15, 2012, Holden spoke with Chaplain Henderson about starting a Humanist group. Henderson provided Holden a BP-822 form.

111.    Henderson recommended that Holden not use the term "Humanist" to describe his religion because the BOP views Humanism as a philosophy, not a religion.

112.    Henderson advised Holden to use the term "Atheist" instead.

113.    Henderson then suggested Holden forgo the BP-822 and instead informally request time for Atheists by "cop out."

114.    A "cop out" is a BP S148.055 "Inmate Request to Staff" form, which is a standard form for inmate grievances and requests.

115.    On April 29, 2012, Holden submitted a cop out to the Chaplain's office requesting time for Atheist inmates to meet as a study group.

116.    On June 11, 2012, Holden met with Head Chaplain Ronald Richter ("Richter") who informed Roy Rudy, inmate# 15876-006, and Holden that Holden's request for time for Atheists to meet was denied.

117.    Richter suggested that they try to have their religious needs met through the Education Department.

118.    On July 8, 2012, Richter wrote to Holden on his form BP-S148.055: "Chapel programming is limited to religious programs. Programs that are moralistic / philosophical in nature might be conducted in education department. Contact Education department and see if you might be able to set something up there." A copy of this correspondence is attached herein as Exhibit 2.

119.    On a cop out form dated July 13, 2012, Holden submitted a request to Supervisor of Education, Sue Cain ("Cain"), requesting a meeting to discuss having Humanist group meetings in the Education Department (attached herein as Exhibits 3-4).

120.    Attached to Holden's cop out form was a copy of the suggestion from Chaplain Richter, a basic history and description of Humanism, and the Humanist Manifesto III.

121.    On July 18, 2012, Holden submitted to Warden Feather a request to establish "Humanists of Sheridan" as an Inmate Organization ("IO") in accordance with BOP PS 5381.05. Inmate Organizations.  (Exhibit 5, attached herein).

122.    Holden sought to have Humanist inmates meet on the same terms that other religious traditions were permitted to meet.

123.    In his cop out request to Feather, Holden wrote in part: "The purpose of Humanism is to affirm our ability and responsibility to lead ethical lives of personal fulfillment that aspire to the greater goal of humanity without supernaturalism. The organization's objectives are the promotion of humanist values & practices." Holden also provided the typed Constitution and Bylaws for his Humanist group. (Exhibit 5, attached herein).

124.    In a letter dated August 1, 2012, Feather denied Holden's request to establish a Humanist group. (Exhibit 6, attached herein).

125.    On August 6, 2012, Holden submitted another cop out request to Feather to establish a Humanists group, providing additional background information for Feather to consider. (Exhibit 7, attached herein).

126.    In the request, Holden wrote in part: "While there are elements of Humanism that can be called 'self-improvement,' Humanism's focus is less on what any one individual can do for himself and more on the cooperative effort of many individuals to effect the betterment of society. Affiliates and chapters of the American Humanist Association (AHA) encourage social relationships necessary of this cooperative effort."

127.    Holden further wrote: "The prison community does not yet provide individuals the means to generate, develop, or cultivate the social ties of Humanism."

128.    Holden added: "The reason I submitted a request for an Inmate Organization was because Religious Services denied my request to provide equal time for Humanists. My request was denied because Humanism, according to the Religious Issues Committee (RIC), 'is a philosophy, not a religion.' The IRC's [sic] reasoning is fallacious: first, Religious Humanism was founded in the 1920s by John Dietrich and is still alive today in many Unitarian Universalist congregations, Ethical Culture societies, and many affiliates and chapters of the AHA; second, Humanism deals with the same matters of ultimate concern for the individual as other religions do; and third, Secular Humanism was declared a religion in the unanimous decision of the Supreme Court delivered in Justice Black's opinion in Torcaso v. Watkins, 1961."

129.    Holden wrote: "My opinion is that Humanism is better served under the aegis of Religious Services. However, because of the RIC's denial, the next available option that would qualify our Humanist group for the same kinds of resources as other religious groups would be the Inmate Organization provision."

130.    The BOP's justification for the denial of Holden's request to form a Humanist group was that Humanist groups should not be allowed in Religious Services because Humanism is a philosophy not religion.

131.    On September 4, 2012, Holden received Cain's response (dated 8/17/12) to his request to form a Humanist group through the Education Department. Cain denied his request. (Exhibit 4, attached herein).

132.    Cain informed Holden that the Education Department "can't support groups either for or against theism."

133.    On September 15, 2012, Holden spoke with new Head Chaplain Myers ("Myers") about the BP-822 form.

134.    Myers informed Holden that Humanism is not a religion.

135.    Myers discouraged Holden from filing the BP-822.

136.    Myers told Holden his application to recognize Humanism would not be successful.

137.    On October 5, 2012, Holden submitted the BP-822 form, seeking formal recognition of Humanism. A copy of the form submitted by Holden is attached herein as Exhibit 8.

138.    Holden submitted the BP-822 form so that he could have Humanist as his religious assignment in SENTRY and so that he could establish a Humanist study group within Religious Services.

139.    Holden wrote in regards to Item 1.A. of the form ("Basic History"): "Religious Humanism in America was born out of the Unitarian Universalist church around 1915. American Humanist Association founded in 1941 as religious organization. Cited as religion in 1961 supreme court ruling Torcaso v Watkins. (see attached: 1.A.)."

140.    In the attachment to the form, in regards to 1.A., Holden provided an extended discussion of the history of Humanism as a religion.

141.    Among other things, Holden pointed out: "Around 1915, Unitarian minister John Dietrich developed a church community that dispensed with any notion of God and the supernatural.  This church celebrated and deepened human knowledge and ethics by means of science and the humanities. Dietrich liked that the word 'Humanism' echoed with connection to the Renaissance Humanists in Europe, who had pushed Christianity away from rigid dogma about the mind of God toward an embrace of this life for its own sake. And so the leader adopted Humanism as the name for his religion, and he preached it. In 1933, John Dietrich along with more than twenty additional clergymen, educators, and progressive intellectuals, issued the Humanist Manifesto as a declaration of values for those who were good without God."

142.    Holden added: "Rabbi Sherwin Wine founded the first-ever synagogue without God in 1963.  His synagogue was meant to function as a community center for people, not a house of God. The congregation focused on human needs, especially the need to strive together for human dignity.  The religion became known as Humanistic Judaism and is now spread all over the world."

143.    Holden wrote in regards to Item I.B ("Theology"): "Humanism claims God is important literary character and places human-kind into the throne occupied by God in theistic religions. (see attached: 1.B.)."

144.    He elaborated in the attachment for 1.B: "Humanism makes the theological claim that God is the most important, influential literary character human beings have ever created. We created God in our image to fulfill our hopes and dreams of eternity. Humanists deny that the traditional theistic God exists. Humanism places Humanity into the throne that is occupied by a supreme being in theistic religions. Theists who claim to derive meaning from God are simply

reading into nature their own conceptions of a deity. If we dispense with the idea of God, meaning does not collapse, because meaning is derived from human experience."

145.    In Item 3.B. ("Required Weekly Observances") Holden wrote: "Personal growth is enhanced by community development and realization of Humanist aspirations through weekly meetings."

146.    In Item 3.C. ("Required Occasional Observances"), Holden wrote: "Humanists commemorate the major transitions in life such as birth, marriage, death, etc."

147.    In Item 3.D. ("Religious Holy Days"), Holden wrote: "Humanists celebrate the holidays of their culture consistent with their humanist beliefs. Humanists invented Darwin Day and HumanLight (see attached: 3.D.)."

148.    In the attachment, Holden explained: "HumanLight is an explicitly humanist alternative to the solstice holidays which incorporates some similar traditions of those holidays such as gift giving and creative banquets."

149.    With respect to "Sacred Literature," Holden wrote in part: "Humanists view the accumulative contribution of all mankind to literature, the arts, and science as sacred. Humanism adopts the sound principles of other religions and philosophies. Thus, although it regards the supernatural aspects of Christianity as poetic myth, it incorporates much of the Judeo-Christian ethic as set forth in the Old and New Testaments." (Exhibit 8).

150.    On or about October 5, 2012, Myers informed Holden that he was not interested in reading Holden's BP-822 form. Myers indicated that he would forward the form to the Warden.

151.    On November 4, 2012, Holden submitted a cop out to Myers requesting that Arthur Jackson be identified as his Minister of Record on his visiting list.  Jackson was added to his approved visitor list.  Arthur Jackson is a member of the AHA and the Humanist Community in Silicon Valley. He is a Humanist Celebrant, certified by the Humanist Society, and is legally authorized to perform marriage, child naming ("baptism"), memorial ("funeral") and invocation ceremonies.

152.    On December 7, 2012, Holden spoke with Warden Feather about his BP-822 request.  Feather suggested Holden speak with the Chaplain instead.

153.    On February 28, 2013, Chaplain Kowalczyk, then Supervisor of Religious Services, informed Holden that his BP-822 request was denied.

154.    Kowalczyk informed Holden that Humanism is an individualized religion that does not fit criteria that congregational religions do.

155.    Kowalczyk asserted that if he accommodated Humanists with group meeting time, that it would be a contradiction—"a congregation of individuals."

156.    Kowalczyk also suggested that Humanism does not fit what he believes is necessary for a congregation.  He said to Holden that congregations are mandated by God or their ultimate concern to make religious observances.

157.    Humanists are united under the Humanist Manifesto III. (A copy of the Humanist Manifesto III is attached herein as Exhibit 9). This document is a consensus of what Humanists do believe. The ultimate concern for Humanists is to lead ethical lives of personal fulfillment that aspire to the greater good of humanity.

158.    Holden informed Kowalczyk that Humanists are united under the Humanist Manifesto III.

159.    By the end of their meeting, Kowalczyk admitted that the BOP's position on religious Humanist groups is not current with the societal view.

160.    However, Kowalczyk still refused to grant Holden's request to recognize Humanist as a religious assignment and to allow Holden to form a Humanist study group.

161.    Instead, Kowalczyk recommended that the Humanist inmates work with the Education Department to set up a group through education services. Holden explained that he already attempted to do that and that his request was denied.

162.    On March 4, 2013, Holden submitted an Informal Resolution to Mr. Brooks ("Brooks"), Form BP-8, which is required prior to filing a Request for Administrative Remedy Form or BP-9.

163.    On March 6, 2013, Holden's Informal Resolution was answered by Brooks. Brooks wrote: "After review of the New or Unfamiliar Religious Components Questionnaire it was determined that the purpose of the Humanists is to conduct an individual, non-theistic, secular and naturalistic approach to philosophy while focusing on personal humanistic ideas, developments and resolutions. The stated needs and purposes are more philosophical and educational in nature than religious. These purposes can be met more effectively outside of the Religious Services Department." (Exhibit 10, attached herein).

164.    On or about March 11, 2013, Holden submitted a Request for Administrative Remedy Form BP-9 to the Warden, with supporting exhibits.

165.    In a response dated March 14, 2013, Warden Feather affirmed the denial of the request. (Exhibit 11, attached herein).

166.    Feather wrote in part: "This is in response to your Request for Administrative Remedy received on March 11, 2013. As relief, you request that Religious Services allow Humanist inmates to meet as a group and make available 'Humanist' as a religious assignment."

167.    In affirming the denial, Feather explained that a "designation of 'Atheist' already exists to encompass the Humanist point of view." (Exhibit 11).

168.    However, FCI officials previously denied Holden's request to form an Atheist study group as well. Atheist is considered a "religion" at FCI Sheridan.

169.    Humanism is Holden's religion, and the group he wishes to form is religious in nature even though it expressly rejects a belief in a supreme being.

170.    Even if FCI Sheridan permitted the formation of an Atheist study group, Holden wishes to meet with other Humanist inmates who share his sincerely held beliefs and are united under the Humanist Manifesto III.  Holden does not wish to meet in a study group with Atheist inmates who reject the Humanist Manifesto III.

171.    In fact, many views that are atheistic, from Ayn Rand's objectivism to Marxian communism, conflict with Holden's religion of Humanism, which is generally consistent with that described by Humanist Manifesto III. The manifesto provides in part: "Humanists ground values in human welfare shaped by human circumstances, interests, and concerns and extended to the global ecosystem and beyond. We are committed to treating each person as having

inherent worth and dignity, and to making informed choices in a context of freedom consonant with responsibility."

172.    The Humanist Manifesto III further provides: "We seek to minimize the inequities of circumstance and ability, and we support a just distribution of nature's resources and the fruits of human effort so that as many as possible can enjoy a good life."

173.    Requiring Humanist inmates to meet as one umbrella Atheist study group or nothing at all is akin to requiring all Christian inmates to meet as one umbrella Christian study group or nothing at all. More accurately, it is akin to forcing all Jews, Christians, Muslims, and Hindus to meet as one "Theist" group.  However, the FCI instead allows all of these religions to meet separately.

174.    FCI further allows inmates of Theistic religions to meet in subgroups.

175.    The Jehovah's Witness inmates meet in a study group separate from the 7th Day Adventists.  The Catholics have their own study group. The Mormons have their own study group.

176.    The Nation of Islam has a study group separate from the Muslim Study group.

177.    The Druid inmates meet in a study group separate from the Odinist / Asatru study group. These inmates are not compelled to meet as one Pagan study group or nothing at all.

178.    In addition to forming a Humanist study group, Holden also wishes to reserve time in Religious Services for Humanist Worship.

179.    Holden would be permitted to arrange for a time and place for Humanist worship services in Religious Services if Humanist was recognized by the FCI as a religious assignment.

180.    Humanist Worship time would be used for volunteers from the community to give talks about Humanism or for inmates to share personal stories about their beliefs. Holden intends to use the model of Sharing Circles for worship time, a place where one can express oneself without fear of criticism or ridicule.

181.    On March 18, 2013, Holden mailed the Administrative Remedy Form BP-10 (signed on 3/17/2013) to the Western Regional Office, attaching supporting exhibits and a copy of his BP-9 form. (Exhibit 12).

182.    On April 24, 2013, Holden received the response to his BP-10 form. The Regional Director Juan D. Castillo ("Castillo") signed the response on April 3, 2013, affirming the denial of Holden's request for: (1) Humanist inmates to be allowed to meet as a group in Religious Services and (2) the creation of a Humanist religious assignment. (Exhibit 13, attached herein).

183.    On April 28, 2013, Holden mailed the Administrative Remedy Form BP-11 to the Office of the General Counsel, attaching supporting exhibits and copies of previous administrative remedies and their responses.

184.    On May 26, 2013, Holden received a Notice of Rejection of his BP-11 Form (#725733-A1), delivered to him by Brooks. The Rejection Notice was dated May 9, 2013.  The resubmission deadline was May 24, 2013 (15 days from the Rejection Notice date).  Therefore, the deadline had already passed when Holden received the notice.

185.    On May 29, 2013, Unit Manager S. Price sent a letter to the U.S. Department of Justice on Holden's behalf, indicating that Holden was unable to timely resubmit his form through no fault of his own. (Exhibit 14, attached herein).  The letter wrote in part: "His appeal was rejected due to lack of required copies needed to process the BP-11. However, the BP-11

rejection was dated May 9, 2013, but was not received by this institution until Friday, May 24, 2013, and then given to the inmate on Sunday, May 26, 2013. Your directive indicated the inmate needed to resubmit within 15 days. This could not be met due to the untimely receipt of the BP-11 rejection. Specifically, we received the rejection the same day the remedy was due in your office. This information was verified by institution staff."

186.    On May 30, 2013, Holden resubmitted his BP-11, objecting to the rejection #725733-A1, along with supporting exhibits. (Exhibit 15).

187.    On July 2, 2013, Holden's BP-11 was rejected as untimely.

188.    On July 5, 2013, Holden was directed by Captain Wolmendorf to send a cop out to Administrative Coordinator Mr. Thompson for instructions on how to proceed in order to exhaust his administrative remedies.

189.    On July 8, 2013, Holden sent a cop out to Mr. Thompson as instructed.

190.    On July 16, 2013, Warden Feather responded to the cop out. She directed Holden to discuss his inability to file his remedy with the Unit Manager Mr. Price. Holden had previously taken this action and had obtained a verification of the reason for his untimely filing from Mr. Price. (Exhibit 14).

## CAUSES OF ACTION

### COUNT 1: ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT

191.    All preceding allegations are incorporated herein by reference.

192. The actions of the Defendants and their agents, servants, or employees, as described above, violate the Establishment Clause of the First Amendment of the United States Constitution (the "Establishment Clause"). Said violations include, but are not limited to:

i. The Defendants' refusal to recognize Humanist as a religious assignment.

ii. The Defendants' refusal to permit the formation of a Humanist study group within Religious Services.

iii. The Defendants' refusal to permit a Humanist inmate to form a Humanist study group to meet with other Humanist inmates to study and discuss their commonly held religious beliefs on the same terms the Defendants authorize groups for inmates of other faith traditions.

iv. The Defendants' refusal to permit an inmate with the FCI-recognized religious assignment of "Atheist" to form an Atheist study group to meet with other Atheist inmates to study and discuss their commonly held religious beliefs on the same terms the Defendants authorize groups for inmates of other FCI-recognized religious traditions.

v. The Defendants' policy and practice of permitting inmates of Theistic religions to identify with, and meet with others in Religious Services of, a particular Theistic religion such as "Jewish," "Muslim," "Hindu," "Buddhist," "Protestant," and "Catholic," while refusing to allow Atheist inmates to identify with, and meet with others in Religious Services of, a particular Non-Theistic religion such as "Humanist."

vi. The Defendants' formal recognition of sub-groups within certain religions including Christianity, Paganism and Islam but not sub-groups of Atheist religions such as Humanism.

193.    The Defendants' actions described above lack a secular purpose, have the effect of promoting, favoring and endorsing some religions over others, and result in an excessive entanglement between government and religion. Said actions also fail strict scrutiny because they lack a compelling governmental interest and the means used to achieve any said interest are not narrowly tailored.

194.    Each of the individual Defendants, in their individual capacities, intentionally or recklessly violated Holden's well-settled constitutional rights under the Establishment Clause.

195.    The Defendants acted under color of law in violating the First Amendment as described herein in violation of 42 U.S.C. § 1983.

**COUNT 2: EQUAL PROTECTION UNDER THE FIFTH AMENDMENT**

196.    All preceding allegations are incorporated herein by reference.

197.    The Defendants' refusal to recognize Humanist as a religious assignment violates the Equal Protection component of the Fifth Amendment to the United States Constitution ("Equal Protection Clause"). Said violations include, but are not limited to:

i.    The Defendants' refusal to permit a Humanist inmate to form a study group to meet with other Humanist inmates to study and discuss their commonly held religious beliefs on the same terms the Defendants authorize groups for inmates of other faith traditions.

ii.    The Defendants' refusal to permit an inmate with the FCI-recognized religious assignment of "Atheist" to form an Atheist group to study and discuss their commonly held religious beliefs on the same terms the Defendants authorize groups for inmates of other officially recognized faith traditions.

iii.   The Defendants' policy and practice of permitting inmates of Theistic religions to identify with, and meet with others in Religious Services of, a particular Theistic religion such as "Jewish," "Muslim," "Hindu," "Buddhist," "Protestant," and "Catholic" while refusing to allow Atheist inmates to identify with, and meet with others in Religious Services of, a particular Non-Theistic religion such as "Humanist."

iv.   The Defendants' recognition of sub-groups of certain religions including Christianity, Paganism and Islam but not sub-groups of Atheist religions such as Humanism.

v.   The Defendants' refusal to allow non-theistic inmates who identify as either Atheist or Humanist to meet on the same terms the Defendants authorize similarly situated theistic inmates to meet, including but not limited to those who identify as Catholic, Muslim, or Buddhist.

198.    The Defendants' actions described above lack a compelling, important or even legitimate governmental interest therefore violating the Equal Protection Clause.

199.    Each of the individual Defendants, in their individual capacities, intentionally or recklessly violated Holden's well-settled constitutional rights under the Equal Protection Clause.

200.    The Defendants acted under color of law in violating the Fifth Amendment as described herein in violation of 42 U.S.C. § 1983.

**COUNT 3: BIVENS DAMAGES FOR VIOLATION OF CONSTITUTIONAL RIGHTS**

201.    All preceding allegations are incorporated herein by reference.

202.    The above-described violations of the First and Fifth Amendments resulted in damages to Holden.

36- VERIFIED COMPLAINT

203.     Holden suffered damages for the loss of the ability to exercise his religion, for being singled out for unequal treatment, and for being discriminated against on the basis of his religion.  He lost the opportunity to benefit from studying Humanist values with his peers and with outside volunteers.  He lost the rehabilitative benefits of practicing his religion with his peers and with outside volunteers.  Each of these losses caused harm in their own right and caused him emotional distress.  The amount of damages is to be determined by a jury.

## RELIEF SOUGHT

204.     All preceding allegations are incorporated herein by reference.

205.     The Plaintiffs request that this Court grant the following relief:

i.   A declaratory judgment that the Defendants' actions violated the Establishment Clause of the First Amendment to the United States Constitution.

ii.   A declaratory judgment that the following actions of the Defendants violate the Establishment Clause:

a.     The Defendants' refusal to permit a Humanist inmate to form a study group to meet with other Humanist inmates to study and discuss their commonly held religious beliefs on the same terms the Defendants authorize groups for inmates of other faith traditions.

b.     The Defendants' policy and practice of permitting inmates of Theistic religions to identify with, and meet with others in Religious Services of, a particular Theistic religion such as "Jewish," "Muslim," "Hindu," "Buddhist," "Protestant," and "Catholic" while refusing to allow Atheist inmates to identify with, and meet with others in Religious Services of, a particular Non-Theistic religion such as "Humanist."

      c.    The Defendants' recognition of sub-groups of certain religions including Christianity, Paganism and Islam but not sub-groups of Atheist religions such as Humanism.

      d.    The Defendants' refusal to permit an inmate with the FCI-recognized religious assignment of "Atheist" to form an Atheist group to meet with other Atheist inmates to study and discuss their commonly held religious beliefs on the same terms the Defendants authorize groups for inmates of other FCI-recognized religions.

    iii.   A declaratory judgment that the above actions of the Defendants':

      a.    lack a secular purpose;

      b.    have the effect of endorsing, favoring, and preferring some religions over others, and in particular, Theistic religions over Non-Theistic religions; and

      c.    result in excessive government entanglement with religion.

    iv.   A declaratory judgment that the Defendants' actions violated the Equal Protection Clause of the Fifth Amendment to the United States Constitution ("Equal Protection Clause").

    v.   A declaratory judgment that the following actions of the Defendants violate the Equal Protection Clause:

      a.    The Defendants' refusal to recognize Humanist as a religious assignment.

      b.    The Defendants' refusal to permit a Humanist inmate to form a Humanist study group to meet with other Humanist inmates to study and discuss their commonly held religious beliefs on the same terms the Defendants authorize groups for inmates of other faith traditions.

38- VERIFIED COMPLAINT

    c.    The Defendants' refusal to permit an inmate with the FCI-recognized religious assignment of "Atheist" to form an Atheist group to study and discuss their commonly held beliefs on the same terms the Defendants authorize groups for inmates of other FCI-recognized religions.

    d.    The Defendants' policy and practice of permitting inmates of Theistic religions to identify with, and meet with others in Religious Services of, a particular Theistic religion such as "Jewish," "Muslim," "Hindu," "Buddhist," "Protestant," and "Catholic" while refusing to allow Atheist inmates to identify with, and meet with others in Religious Services of, a particular Non-Theistic religion such as "Humanist."

    e.    The Defendants' formal recognition of sub-groups of certain religions including Christianity, Paganism and Islam but not sub-groups of Atheist religions such as Humanism.

    f.    The Defendants' actions in refusing to allow non-theistic inmates who identify as either Atheist or Humanist to meet on the same terms the Defendants authorize similarly situated theistic inmates to meet, including but not limited to those who identify as Catholic, Muslim, or Jewish.

    vi.  A declaratory judgment that the above actions of the Defendants lack a compelling, important or legitimate governmental interest in violation of the Equal Protection Clause.

    vii.  A declaratory judgment that the Defendants discriminated against Holden on account of his religious beliefs in violation of the Equal Protection Clause.

39- VERIFIED COMPLAINT

viii.    A declaratory judgment that the Defendants' discrimination against Humanist inmates lacks a compelling, important or legitimate governmental interest in violation of the Equal Protection Clause.

ix.    A declaratory judgment that Feather, in her individual capacity, violated the Establishment Clause and Equal Protection Clause.

x.    A declaratory judgment that Feather, in her individual capacity, intentionally or recklessly violated Holden's constitutional rights.

xi.    A declaratory judgment that Kowalczyk, in his individual capacity, violated the Establishment Clause and Equal Protection Clause.

xii.    A declaratory judgment that Kowalczyk, in his individual capacity, intentionally or recklessly violated Holden's constitutional rights.

xiii.    A declaratory judgment that Castillo, in his individual capacity, violated the Establishment Clause and Equal Protection Clause.

xiv.    A declaratory judgment that Castillo, in his individual capacity, intentionally or recklessly violated Holden's constitutional rights.

xv.    A permanent injunction ordering the Defendants, their agents, successors, and any person in active concert with the Defendants to:

        a.    recognize Humanist as a religious assignment option in SENTRY; and

b.    authorize Holden to form a Humanist study group in Religious Services and to allow this group to meet on the same terms the Defendants authorize groups for inmates of other faith traditions.

xvi.    A permanent injunction prohibiting the Defendants, their agents, successors and any person in active concert with the Defendants, from:

a.    refusing to permit a Humanist inmate to form a group to meet with other Humanist inmates on the same terms the Defendants authorize groups for inmates of other faith traditions;

b.    refusing to permit an Atheist inmate to form a group to meet with other Atheist inmates on the same terms the Defendants authorize groups for inmates of other faith traditions; and

c.    otherwise discriminating against Atheist and Humanist inmates.

xvii.    An award of damages to the Plaintiffs against Warden Feather in her individual capacity.

xviii.    An award of damages to the Plaintiffs against Chaplain Kowalczyk in his individual capacity.

xix.    An award of damages to the Plaintiffs against Castillo in his individual capacity.

xx.    An award to the Plaintiffs of their reasonable costs, disbursements and attorneys' fees as allowed by law from the Defendants pursuant to 42 U.S.C. § 1988.

xxi.    An award of such other and further relief as the Court shall deem just.

Respectfully submitted,

Dated: _April 7_____, 2014          *s/*  Benjamin W. Haile _____

BENJAMIN W. HAILE, OSB #040660
Ben@portlandlawcollective.com
Portland Law Collective, LLP
1130 SW Morrison St, Ste 407
Portland, OR  97205
Telephone: (503) 228-1889
Facsimile:  (503) 223-4518

MONICA L. MILLER
American Humanist Association
1777 T Street  N.W., Washington, D.C, 20009
*phone* (202) 238-9088 */ facsimile* (202) 238-9003
mmiller@americanhumanist.org
CA Bar: 288343 / DC Bar: 101625
(*pro hav vice* pending)

DAVID A. NIOSE
Law Offices of David Niose
348 Lunenburg Street, Suite 202
Fitchburg, MA 01420
978-343-0800
dniose@nioselaw.com
Mass Bar: 556484
(*pro hav vice* pending)

**ATTORNEYS FOR PLAINTIFFS**

**<u>VERIFICATION</u>**

I, the undersigned Plaintiff, Jason Michael Holden, have read this Verified Complaint and the same is, by my own knowledge and upon information furnished to me, true.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 28, 2014

*Jason Michael Holden*
Jason Michael Holden

43- VERIFIED COMPLAINT